654 So.2d 843 (1995)
Marshall P. PLUMMER,
v.
MARRIOTT CORPORATION, Michael Johnston, Pendleton Detectives, Inc., and John Kloos.
No. 94-CA-2025.
Court of Appeal of Louisiana, Fourth Circuit.
April 26, 1995.
*845 I. Harold Koretzky, Elvige C. Richards, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, L.L.C., New Orleans, Carlton J. Trosclair, Washington, DC, of counsel, for defendant/appellant.
Daryl A. Higgins, Thomas W. Darling, Windhorst, Gaudry, Ranson, Higgins & Gremillion, L.L.P., Gretna, for plaintiff/appellee.
Before KLEES, LOBRANO and LANDRIEU, JJ.
LOBRANO, Judge.
This appeal arises from a judgment in favor of plaintiff-appellee, Marshall Plummer, and against defendant-appellant, Marriott Corporation, in the amount of $650,000.00 for past, present and future mental anguish and lost wages for violation of Louisiana's Anti-Discrimination Statute, R.S. 23:1006.

FACTS AND PROCEDURAL HISTORY:
Marshall Plummer was hired by Marriott Corporation, a hotel chain, in 1972 following an honorable discharge from the military. Within three years, Plummer was promoted to Director of Security at the New Orleans Marriott Hotel.
In March of 1986, following thefts of hotel and guest property implicating the security department, an internal investigation resulted in the discharge of five of eleven security officers under Plummer's supervision. As part of the investigation, the entire security department was polygraphed, including Plummer. Plummer passed the test. The five security officers who were discharged failed the test. Employees in other departments were also polygraphed. Two housekeeping employees, and a housekeeping supervisor, were discharged after failing the polygraph test.
Marriott concluded that a change in Plummer's position as director of the security department was necessary. On March 20, 1986, Marriott management presented Plummer with four (4) options regarding his future with the hotel system: (1) move to a smaller property within the Marriott system as head of security; (2) remain at the New Orleans Marriott as the number two person in security; (3) remain at the New Orleans Marriott in another department; or (4) resign. The options were not reduced to writing. Present when the options were presented were Lucio Benedetto, Southern Regional Vice President, John Ceriale, outgoing General Manager in New Orleans and Bruce Gorelick, Resident Manager in New Orleans.
Ceriale and Benedetto told Plummer to take paid time off to consider the options. After the time off, Plummer was to notify Marriott of his decision. Plummer left as directed. Fifteen days later, Plummer went to see resident manager, Bruce Gorelick. A conversation took place between the two men much of which is the subject of this litigation. The conversation concerned the various options *846 available to Plummer. Following his conversation with Gorelick, Plummer went to see personnel director, Michael Johnston. They also discussed the various options. Following his conversations with Gorelick and Johnston, Plummer decided to resign. He drew up his letter of resignation and presented it to Gorelick on April 4, 1986. On April 18, 1986, Marriott, thru Michael Johnston, accepted Plummer's resignation. Upon resigning Plummer received a monetary package totaling approximately $151,000.00.[1]
On April 4, 1987, Plummer filed a Petition for Damages in Civil District Court of the Parish of Orleans. In his petition, Plummer alleged invasion of privacy, intentional infliction of emotional distress, defamation and racial discrimination in employment against Marriott Corporation, Michael Johnston, Pendleton Detectives and John Kloos. Prior to trial, Plummer dismissed the first three claims and defendants Pendleton Detectives and John Kloos.
A six day trial began June 13, 1994 on the issue of employment discrimination against Marriott and Johnston. On June 17, 1994, the trial court granted a directed verdict dismissing Johnston. After trial, the jury found that Plummer proved by a preponderance of the evidence that Marriott intentionally discriminated against, and constructively discharged, Plummer.[2] The jury also found that Marriott failed to prove that Plummer did not make a reasonable effort to seek similar employment.[3] The jury awarded Plummer $218,000.00 for past, present and future mental distress and anguish; $216,000.00 in past lost wages and $216,000.00 in future lost wages for a total award of $650,000.00. On July 25, 1994, the trial court denied Marriott's Motion for Judgment Notwithstanding the Verdict.
Marriott appeals the judgment of the trial court asserting the following assignments of error:
1) There was insufficient evidence to support the jury's finding that Marriott intentionally discriminated against, and constructively discharged, Plummer based on his race;
2) The jury erred by finding that Plummer mitigated his damages;
143) It was error for the trial judge to allow an award for front pay;
4) The jury abused its discretion in the amount of damages awarded to Plummer;
5) The trial judge erred by awarding prejudgment interest on post judgment damages;
6) The trial judge erred by permitting plaintiffs counsel to strike jurors for racially discriminatory reasons and in allowing plaintiffs counsel to refer to matters not in evidence and otherwise irrelevant.

THE LAW:

I. STANDARD OF APPELLATE REVIEW:

It is axiomatic that an appellate court may not disturb a jury's findings unless they are clearly wrong or manifestly erroneous. This well established principle was again explained and reiterated by our Supreme Court in the recent case of Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La. 2/20/95), 650 So.2d 742 wherein the Court quoted the following from Rosell v. ESCO, 549 So.2d 840 (La.1989).
"It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. * * * The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual *847 basis for the findings in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighted the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. * * * In applying the manifestly erroneousclearly wrongstandard to the findings below, appellate courts must constantly have in mind that their review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong."

Ferrell at pps. 4, 5, 650 So.2d 742.
See also, Stobart v. State, 617 So.2d 880 (La.1993); Ambrose v. New Orleans Police Amb. Serv., 93-3099, 3110 and 3112 (La. 7/5/94), 639 So.2d 216.
In guiding our review of this case we also find instructive Justice Lemmon's concurring opinion in Ambrose, supra, where he distinguishes manifest error as applied to factual findings, from the review standard for determining sufficiency of evidence. "The manifest error rule is a standard used by appellate courts to resolve conflicting factual evidence; it is not a standard for determining sufficiency of the evidence." Ambrose, supra, at p. 1 (concurring opinion), 639 So.2d at 223. The concurrence further instructs on the application of that principle as follows:
"In application, the manifest error rule becomes part of the standard for determining sufficiency of the evidence. The reviewing court first resolves any factual conflicts by application of the manifest error rule which dictates that the appellate court should not disturb the express or implied factual finding of the trier of fact, (footnote omitted) Accordingly, the reviewing court views all evidence in the light most favorable to the party who prevailed in the trial court, and then determines whether the evidence, consisting of the undisputed facts and of the disputed facts thus viewed under the manifest error rules, was sufficient to preponderate in favor of a conclusion that the plaintiff had proved every element of this cause of action."

Ambrose, at p. 2 (concurring opinion), 639 So.2d at 224.

II. LOUISIANA'S ANTI-DISCRIMINTION STATUTER.S. 23:1006:

Louisiana Revised Statute 23:1006[4] provides in pertinent part:
* * * * * *
"B. (1) it shall be unlawful discrimination in employment for an employer to:
(a) Intentionally fail or refuse to hire, refer, discharge, or to otherwise intentionally discriminate against or in favor of an individual with respect to compensation, terms, conditions, or privileges of employment because of race, color, religion, sex, disability as defined in R.S. 51:2232(11), or national origin.
(b) Intentionally limit, segregate, or classify an employee in a way which would deprive an individual of employment opportunities, give a favor of advantage to one individual over another, or otherwise adversely or favorably affect the status of *848 an employee because of race, color, religion, sex disability as defined in R.S. 51:2232(11), or national origin.
* * * * * *
D. A plaintiff who has a cause of action against an employer for discrimination in employment may file a suit in the district court for the parish in which the alleged discrimination occurred seeking general or special compensatory damages, back pay, restoration of employment, related benefits, reasonable attorney's fees, and court costs." (emphasis added).
Because the Louisiana statute is similar in scope to the federal anti-discrimination prohibitions in Title VII of the Civil Rights Act of 1964, Louisiana courts have routinely looked to the federal jurisprudence for guidance in determining whether a claim has been asserted. See, Alphonse v. Omni Hotels Management Corp., 643 So.2d 836 (La. App. 4th Cir.1994); Bennett v. Corroon and Black Corp., 517 So.2d 1245 (La.App. 4th Cir.1987), writ den., 520 So.2d 425 (La.1988).[5]
The plaintiff bears the ultimate burden of proving the defendant intentionally discriminated against the plaintiff based on race. St. Mary's Honor Center v. Hicks, ___ U.S. ___, ___, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). However, the scheme of proof under federal jurisprudence requires that plaintiff first establish by a preponderance of the evidence, a "prima facie" case of racial discrimination. The elements of a prima facie case in a factual situation such as the one presented in the instant case are (1) the plaintiff is black; (2) he was qualified for the position; (3) he was discharged, either actually or constructively; and (4) the position remained open and was ultimately filled by a white male. St. Mary's Honor Center, supra, citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[6]
If a prima facie case is established, a presumption is created that the employer has unlawfully discriminated against the employee. The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).
Determining whether a defendant met its burden of production is made without reference to whether the defendant was persuasive, and does not involve any credibility assessment. St. Mary's Honor Center, supra, ___ U.S. at ___, 113 S.Ct. at 2747. Once the defendant carries its burden of production, the presumption created by the prima facie showing is rebutted and "drops from the case". Id. at ___, ___, 113 S.Ct. 2747, 2749, citing Burdine, 450 U.S. at 255, 101 S.Ct. at 1094-95 (1981). To prove that discrimination was the real reason for the adverse action the plaintiff must show it would not have been taken but for discriminatory animus. See, Mechnig v. Sears Roebuck & Co., 864 F.2d 1359, 1364 (7th Cir. 1988).
Even an incorrect belief that an employee's performance was inadequate constitutes a legitimate non-discriminatory reason *849 for an employer's decision. It is not for the courts to decide whether they agree or disagree with an employer's good faith belief as to an employee's competence. Little v. Republic Refining Co. Ltd., 924 F.2d 93, 97 (5th Cir.1991), citing De Anda v. St. Joseph Hosp., 671 F.2d 850, 854 n. 6 (5th Cir.1982). Mere conclusory statements or personal beliefs by an employee that he was discriminated against are not sufficient to prove his employer discriminated against him. Little, supra, 924 F.2d at 96, citing, Elliott v. Group Medical & Surgical Service, 714 F.2d 556, 567 (5th Cir.1983), cert, denied, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984).
To prove constructive discharge, the plaintiff must prove that the employer intended to and deliberately created such intolerable working conditions that the employee was forced into involuntary resignation. To find that a constructive discharge has occurred, the trier of fact must be satisfied that the working conditions to which the employee was subjected were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. Ugalde v. W.A. McKenzie Asphalt Co., 990 F.2d 239, 243 (5th Cir. 1993) citing, Jurgens v. EEOC, 903 F.2d 386 (5th Cir. 1990) and Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65 (5th Cir.1980). The burden is on the employee to prove constructive discharge. Boze v. Branstetter, 912 F.2d 801, 804, 805 (5th Cir. 1990).
The intolerable conduct must be of a greater severity or pervasiveness than the minimum required to prove a hostile working environment Landgraf v. USI Film Prodacts, 968 F.2d 427, 430 (5th Cir.1992), aff'd ___ U.S. ___, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).
A single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge. Watson v. Nationwide Insurance Co., 823 F.2d 360, 361 (9th Cir. 1987). Title VII policies are best served when the parties, where possible, attack discrimination within the context of their existing employment relationship. Watson, supra at 361. Thus, a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment. Watson, supra at 361.
The mere existence of a grievance procedure and a policy against discrimination coupled with a plaintiffs failure to invoke the procedure does not insulate the employer from liability. These facts are relevant, but not necessarily dispositive. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 71-73, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986).
With these legal principles in mind, and after careful review of the evidence, we hold: (1) the jury was clearly wrong in concluding that Plummer was constructively discharged; and (2) the evidence is insufficient to support a finding of racial discrimination.
In order to reach these conclusions, we review, in detail, the pertinent trial testimony

III. TRIAL TESTIMONY:

BRUCE GORELICK (Resident Manager)[7]
Bruce Gorelick testified that he became the resident manager of the New Orleans Marriott in September, 1984. In familiarizing himself with his employees, he concluded from Plummer's personnel file that Plummer was weak in leadership. Morale in the security department was low. Various security officers had filed complaints that Plummer showed favoritism in handing out discipline. Four black officers threatened to take jobs at another hotel because of alleged unfair treatment by Plummer. Gorelick stated that as manager he felt it was his responsibility to assist Plummer in improving his leadership and discipline skills. Gorelick testified that he did not doubt Plummer's integrity, but had received information from other managers who expressed some concern about his honesty. He also received comments about Plummer's strengths as head of security. He viewed any problems or weaknesses *850 of Plummer as a challenge for him to help Plummer overcome.
In evaluating Plummer's performance ratings before and after 1985, Gorelick stated that overall they were basically the same. He explained that each manager received two yearly evaluations. One was a financial evaluation in which general numerical ratings were given to determine if a yearly increase would be given. The second evaluation was a six part appraisal which was extremely detailed. This appraisal was to critique, coach and counsel managers as to specific areas of need in their performance. It was considered a learning tool.
Gorelick's initial evaluation (financial) of Plummer was in March of 1985, while the detailed evaluations were done in November, 1985. Plummer's strengths were in development and loss prevention and technical skills. He received a number one rating for each. In his financial review he received an overall rating of 2 which is commendable. He received a 3 in communication, which is considered competent. The November, 1985 detailed analysis also gave Plummer an overall evaluation of 2. Two 3's were given in communications and on-going critique. Of sixtyseven items listed under the "Performance Standards for Specific Positions," only three showed "needs improvements." Gorelick testified that the numerical ratings Plummer received after his arrival in 1985 were not out of line with those received in the past. This was true because his overall evaluation always exceeded the standard. The need areas stated in the past evaluations were the same as those given 1985. He explained that over the years the evaluation forms differed, and that comparing "apples to apples, they were both identical, same verbiage, `needs improvement'."
Gorelick testified that when he arrived as resident manager, that Plummer's office was in the hallway off of the garage near the employees entrance. He had no knowledge of any other office Plummer may have had prior to his arrival.
He admitted to asking Plummer to accompany Mr. Ceriale and his wife in the French Quarter on their jogging trips because of an incident where Mrs. Ceriale was verbally accosted.
He denied that Plummer's dining privileges were taken from him. He stated that because of a downturn in the economy, it was decided that hotel dining privileges would be scaled back for all managers, not just Plummer.
In 1985, upon learning from Mike Johnston, head of personnel, that Christmas gifts had been stolen, Gorelick informed Plummer and requested an investigation. He admitted denying Plummer's request to administer polygraph tests at that time and stated: "My reasoning was that I was not comfortable at that point, that there was any definition as to who should be polygraphed, why, what was the scope, you know how many people should be polygraphed, who should be polygraphed. So I didn't see any definition. And at that point, I didn't feel that there was sufficient reason to polygraph."
He stated that he was later informed by Johnston that an ex-employee, Angela Perkins, had implicated two security officers and several non-security employees in a hotel theft ring. Perkins also implicated two security officers in the theft of the Christmas gifts. At first Gorelick questioned Perkins' veracity. However, upon hearing the detailed information she provided about the Christmas gifts, as well as other thefts, he believed she was telling the truth. As a result of Perkins' statement, an executive decision was made to question those implicated and to polygraph the security department, including Plummer, as well as other employees. The questioning of those employees was to be done by the various department managers.
When the polygraph results showed that half the security department failed the test, the decision was made that this failure constituted a serious breach in security and that a change was needed because the "integrity of the department was shattered" and there was a "confidence issue". Gorelick stated that it was never suggested that Plummer be terminated. Instead, several options were presented to Plummer at the meeting attended by Lucio Benedetto, regional vice-president, John Ceriale, general manager and *851 Gorelick. Those options consisted of transferring to another hotel, remain in New Orleans in the number two security position, transfer to another department or resign. The options were reviewed with Plummer. None of the options were encouraged or discouraged. Plummer was asked if he felt he could take the demotion to the number two position and still be able to work under someone else. Gorelick testified that the purpose of posing this question to Plummer was to insure that he would consider this when making his decision. No specific other hotels or other departments were mentioned to Plummer at that time. However, Mr. Benedetto told Plummer that it may not be a bad idea to transfer. He told him "I would love to have you as part of my region as well." It was suggested that Plummer take some time off to consider the options before deciding. According to Gorelick, Plummer did not, at that time, state which option he preferred.
Approximately one week later, Plummer made an unannounced visit to Gorelick's office. Plummer asked Gorelick's opinion as to the options. Gorelick told Plummer that he would not tell him what decision to make. He gave ihim the pros and cons of each option, but did not encourage or discourage any one option. He testified that because Plummer came to see him unannounced, no calls had been made to find what other positions, if any, may be available. He told Plummer that he did not know of any opening at other hotels or other departments at that time. He also told Plummer that Mr. Benedetto would stand behind the options to transfer and would take care of it if Plummer decided to transfer. Gorelick described the conversation as cordial and believed Plummer came to him as a friend. He was surprised and disappointed when Plummer resigned because he considered him a valuable employee because of his tenure with Marriott. He stated that he had obtained approval in the past to upgrade Plummer's pay grade two steps in order to increase his salary above the maximum for his current pay grade. This was approved by Mr. Ceriale and Mr. Moyer. He testified that following Plummer's resignation, Plummer's position was filled by an Hispanic male transferred from Chicago. The person who filled the Chicago position was a black male transferred from security in St. Louis.

MICHAEL JOHNSTON (Personnel Manager)
Michael Johnston testified that he became head of personnel at the New Orleans Marriott in the summer of 1985.
Johnston described Plummer's performance as "that which satisfies the requirement of the position." He testified that the position "is being covered in a competent manner and the responsibilities are being handled and the standards are being met." He testified that in 1985 Marriott began a new appraisal system which was job specific. This change was implemented for all department management levels.
Johnston described his personnel department of consisting of nine employees including himself. His assistant, Percy Ewell, and three other employees were black. Marriott's overall employee ratio was 65% black, 10% Hispanic and 30% white.
Johnston testified that he requested that the security officers not use the bathroom next to the personnel office because they were hanging around the office several times per day. He complained to Plummer about this problem.
Johnston stated that when he arrived to begin his job as director of personnel, his office was located on the mezzanine floor. Plummer's office was already located on the rear dock.
Shortly after beginning his duties he was aware that an undercover investigation was being conducted because of a large number of thefts of both guest and hotel property. He testified that he and Plummer had purchased Christmas gifts for employees and had stored them in the personnel office. These gifts were stolen during the night. The following morning he reported the thefts to either John Ceriale or Bruce Gorelick and security.
Security began an investigation. Approximately two months later, an ex-employee, Angela Perkins, who had personally been terminated for theft, came to see Johnston. Perkins told Johnston that the Christmas *852 gifts were not stolen by Lawrence Landry, the young man Plummer was investigating, but by two security officers. Perkins also told Johnston that if you knew the light officer in the security booth at the employee's entrance, you could leave the hotel with anything you wanted. Perkins told Johnston that another employee, Gerald Perry, also observed the thefts.
Johnston requested Perkins give a written statement. Perkins asked first to speak to assistant personnel director, Percy Ewell, because he was black. After speaking to Ewell, Perkins agreed to give the statement. Johnston was directed by legal counsel to obtain a notarized statement from both Perkins and Gerald Perry.
Johnston then contacted Jim Moyer, vice president of loss prevention in Washington D.C. It was subsequently decided at a meeting that took place shortly thereafter that Plummer would be advised of Perkins' statement and his advice sought as to how to proceed. Upon hearing of Perkins accusations, Plummer stated that he was not surprised because he had been suspicious of the two security officers. Moyer indicated his disappointment of Plummer.
The decision was then made to polygraph the entire security department. Plummer was included because it was hotel policy to also polygraph the department manager. Other non-security employees were also polygraphed. Those that failed the test would be terminated. Johnston explained that the decision not to polygraph James Johnson, the manager on duty (MOD) the night of the Christmas gift thefts, was because he was not a department manager. The MOD's job was to primarily oversee the hotel, especially guest relations. He stated, however, that Johnson was eventually polygraphed.
Mike Johnston further testified that Plummer came to see him to discuss the various options that he was presented. He stated he reviewed each option, explaining the "pluses and minuses". He described Plummer as upset. He testified he encouraged him about a possible transfer to Texas where Mr. Benedetto "could make things happen". He stated that Plummer asked questions about such things as vacation and profit sharing if he resigned.
After receiving Plummer's letter of resignation, Johnston discussed keeping Plummer on the payroll so that he would keep medical benefits as long as possible. It was also decided to keep Plummer on the payroll an additional two weeks in order for him to receive an extra 5% in profit sharing. Johnston testified that Plummer told him he didn't want to relocate. Plummer did not complain about the options. Plummer told Johnston that he was told that demoting to the number two position would not be in his or the hotel's best interest because it is difficult to step down and remain at the same hotel.

ANGELA PERKINS (Fonner Employee)
Angela Perkins testified that she had been employed at the Marriott in the housekeeping department. She was fired in 1986 for stealing. Perkins contacted Johnston because she did not want Lawrence Landry blamed for the Christmas thefts because she knew who had stolen them. Perkins described a systematic theft ring involving security officer Janis Garrison and other employees. If an employee wanted to steal, they called the security booth and informed Janis Garrison, the security officer at the employee's entrance. Garrison would then allow them to leave with the merchandise.
Perkins stated she observed the Christmas gifts in the security office with Garrison, but thought they belonged to Garrison.
Perkins stated she gave a written statement. She was not promised anything in exchange for her statement and was not helped in preparing the statement.

JAMES MOYER (Director of Loss Prevention)
James Moyer, vice president of Human Resources, testified that in 1986 he was Director of Loss Prevention.
He was informed of the Christmas gift thefts and that a number of people were implicated, several in security. He asked if Plummer was involved, but was told that no one knew if he was or not.
*853 Moyer stated there was concern before this incident that Plummer was not as proactive as he should be. He needed to be more prevention oriented. He stated that all areas of loss prevention were changing from apprehension to prevention.
According to Moyer Plummer was having difficulty changing his approach. Bruce Gorelick expressed concern about this problem.
Moyer testified that Plummer was polygraphed with the rest of security because this was hotel policy. Moyer was glad that Plummer passed but expressed concern that so many security officers failed the test. When Plummer was told who was implicated, he stated that he was not surprised because he was suspicious of the night shift. According to Moyer, even though Plummer was suspicious, he took no "initiative to do anything about it." Moyer expressed his concern and disappointment to Plummer and told him that the situation was unacceptable. He told Plummer that the senior managers would be consulted and a decision would be made.
Moyer testified that the senior managers voiced two concerns in arriving at their decision. First, they needed to restore the credibility of the security department. Second, they were concerned in "taking care" of Plummer, so that he could remain employed. They wanted to find a hotel where Plummer icould function well because of his years with the Marriott chain. These concerns were the reasons for the options. After Plummer's resignation, he was replaced by an Hispanic male.

LUCIO BENEDETTO (Regional Vice-President)
Lucio Benedetto, Southern Regional vicepresident, testified that he has known Plummer since 1972 or 1973. While Benedetto was general manager of the New Orleans Marriott in 1980, he described Plummer as doing "a good job" and of being trustworthy and a "good performer."
In March of 1986, Benedetto came to the New Orleans property for the general manager's changeover. At that time he was aware of the theft problems being investigated. While in New Orleans, on March 20, 1986, Benedetto testified that he was asked to review the options before they were presented to Plummer because of his longtime relationship with him. Benedetto was made aware that large amounts of property had been stolen and that members of the security department were implicated. It was clear that the credibility of the security department had to be re-established. The reason for the options was to give Plummer a choice in order to keep him as an employee. No option was encouraged or discouraged and it was never contemplated to terminate Plummer.
Benedetto testified that at the meeting with Plummer, each option was explained. Plummer was told not to worry, that everything would be done to take care of him. Benedetto directed Plummer to take one or two weeks off with pay to consider his decision. He suggested that Plummer and his wife go to Point Clear, Alabama or Houston or some other Marriott resort in Benedetto's region at Marriott's expense. Benedetto stated that Plummer appeared relieved and said "Mr. B, I thank you very much. It's great to have you here. I know you're gonna do that for me, et cetera, et cetera." He was smiling and relieved because he thought he was going to be terminated.
Benedetto testified that there was no discussion of available transfer positions because no decision had been made by Plummer as to which he would exercise. Several weeks later Benedetto stated he was informed that Plummer resigned. He stated he was surprised, but respected his decision. He approved extra time on the payroll so that Plummer would fully vest in the profitsharing program. He explained that not everyone leaving Marriott's employ receives an option package such as offered Plummer.

MARSHALL P. PLUMMER, III
Plummer testified that he applied for employment with Marriott in June of 1972. He was hired as a security officer. Within ten months he was promoted to shift supervisor. Within a year and a half he was promoted to chief of security. Within three years he was promoted to Director of Security. He was chosen for this position over one other chief of security, a white male. Plummer testified *854 that he received yearly increases and was satisfied with his salary and benefits.
He described an evaluation meeting with Gorelick in 1985 during which he was told that his rating would be reduced, but that would not effect his annual increase in pay. He stated that he told Gorelick that he didn't mind the reduced rating and that it didn't concern him.
Plummer referred to the new general manager, John Ceriale, as a "dictator". He described him as "the king of the castle, king of the hill." He stated that Ceriale did not like being confronted by employees. He briefly described a confrontation with Ceriale over some money the hotel was holding that belonged to him, but he could not remember the details. He felt Ceriale didn't like him especially following an incident in the French Quarter which involved a black male. While jogging, Mrs. Ceriale had been verbally accosted by this black male. Plummer was asked to accompany the Ceriales the following day. Mr. Ceriale pointed out the black male, who appeared to be a homeless street person. Plummer stated that he recognized the man from the St. Bernard housing project where he lived as a child. He approached the man, explained the problem, and the man tried to apologize. Ceriale refused the apology and made a threatening remark to the man. Plummer felt that Ceriale was upset because the man was black and he was black. He stated that he believed Ceriale wanted him (Plummer) to do bodily harm to the man and when he did not, Ceriale became angry.
Plummer also described two incidents where he felt he was singled out. One involved a reduction in management dining privileges and the other involved the moving of his office to the back dock. He believed he was denied the dining privilege because only he and the executive committee, which was all white, had these privileges. He admitted that he was asked to give up his office on the mezzanine level because personnel needed additional space.
When the hotel Christmas gifts were stolen from the personnel office he began an investigation which focused on a young housekeeping employee named Lawrence Landry. Eventually the investigation reached a stalemate. Landry vehemently denied he stole the gifts and Plummer could find no proof to the contrary. Plummer then requested that Bruce Gorelick allow him to polygraph certain individuals to use as an investigative tool. Plummer testified that he was shocked when Gorelick denied his request because Gorelick seemed so adamant about catching the person responsible. He was also shocked because he had never been refused in the past after explaining the situation and justifying the need for the test.
Later it was discovered, through former employee Angela Perkins, that the gifts were stolen by Janis Garrison and another security officer. When Plummer was informed by management that polygraph tests would be given to all security personnel, including himself, he stated that he had no problem with that decision. Employees of other departments were also given the test but he was not informed of this initially because he was not head of those departments.
Several days after he took the polygraph test, Plummer was summoned to a meeting with upper management.[8] At this meeting he was presented with several options. Mr. Benedetto told Plummer that the options were being presented because "you're a longterm employee. You've been here 14 years. That's why you're receiving these options." No one option was encouraged or discouraged. Plummer testified that he felt he received fair treatment and that management was honest and sincere in giving him the options. He admitted that he felt some disciplinary action would be taken. Plummer admitted that he always wanted to transfer to another hotel and that his wife liked the idea as well.
Plummer testified that when he went to see Gorelick to discuss the options, Gorelick told him there was nothing available either at another hotel or another department. When asked about taking the number two security position, he said that Gorelick told him the new director stated he wouldn't be able to *855 work with him. He also testified that Gorelick told him the number two position would jjijbe on the midnight shift and would be hourly. He felt that he was being "constructively terminated", so he resigned. He stated he felt they were "subconsciously" forcing him to resign.
On cross-examination, Plummer admitted that even though he had suspicions about Janis Garrison even before the Christmas gift theft, he did not investigate her by putting surveillance on the security booth. He admitted that the hotel began to experience a large number of thefts in 1985 and that hotel security was his responsibility. He testified that the thefts did place a cloud over the security department and he felt that some kind of disciplinary action would be taken against him. He admitted that he was given time off to consider the options. He also admitted that Gorelick may have said that there was nothing available at another hotel at that time and that he didn't ask him if anything would be available anytime soon.
He described his relationship with Gorelick as good. He described Benedetto as a sincere, sympathetic, honest and a straight shooter.
On re-direct examination, Plummer testified that he did not use Marriott's Guarantee of Fair Treatment procedure if he was dissatisfied because he didn't believe he had any option but to resign. This procedure would have guaranteed Plummer a right to bring his complaints to the divisional vice president who was Lucio Benedetto, Plummer's longtime friend.

EMELDA PLUMMER (Plaintiffs Wife)
Emelda Plummer, plaintiffs wife, testified she and her husband were very satisfied with his salary and benefits and the fact that he had moved up in the hotel. She stated that she and her husband often discussed the possibility of a transfer in order to continue to advance with the Marriott. She stated that neither she nor plaintiff had any problems with the idea of a transfer.
Mrs. Plummer testified that approximately a year and one half before he resigned, plaintiff seemed worried about his job and often would go back to the hotel at night. She stated that after plaintiff received the options, they discussed each and decided the best one was to accept the demotion to the number two position in security. Plaintiff never contemplated resigning. Only the demotion or possibly a transfer was discussed. When plaintiff returned following his meeting with Mr. Gorelick, Mrs. Plummer stated that he informed her that he had resigned because there were no place to transfer and that he felt they did not want him to stay. She testified that plaintiff felt he did not want to work for anyone any longer. After leaving the Marriott, plaintiff tried several businesses of his own but none succeeded.
On cross-examination, Mrs. Plummer stated that as far as she knew none of the options were ever withdrawn. That all plaintiff relayed to her was that he was told that there were no openings at other hotels for him to transfer at that time. She admitted that plaintiff never told her that management specifically stated they didn't want him, but that this was "the impression he got from them." With respect to option number two, he told her that Mr. Gorelick didn't think he would be able to work under someone else.

JAMES E. JOHNSON (Night Manager on Duty)
James Johnson testified that he was employed by Marriott from May, 1978 to August or September, 1989. In 1984/85, he was the night manager or manager on duty. His duties consisted of overseeing the hotel and handling guest problems. His duties did not consist of control or jurisdiction of individual departments. He stated the security department officers acted as his "right hand" if anything occurred such as a fire or medical emergency because they had first aid training.
In his capacity as manager on duty, Johnson stated he frequently saw Plummer, but did not describe their working relationship as close.
He recalled Richard Johnson, a security officer, contacting him regarding time violations which he reported to the then resident manager, Pat Lupshaw. He wrote nightly reports consisting of things such as the quality and quantity of the food, inspection of *856 floors and other incidents or problems during the night. He recalled reporting problems of tardiness with some security personnel. He felt that the security department was deficient in its operation. He also felt that housekeeping, utility, catering, and the front desk were also deficient. As a result of his problems with security, Johnson stated he had a meeting with Plummer, the resident manager, Gorelick, and Ashton Lyons, security officer. The problems with the time cards were discussed. The result was the matter was dismissed. There was no finding that there was stealing of timeone employee clocking in another who was not on the premises. Following this meeting, he had another meeting with Plummer and also with housekeeping to see if the various problems could be worked out. He testified that he questioned some of Plummer's decisions, but did not criticize him because Plummer was above him in grade. He stated that he only discussed problems that he observed.
Johnson testified that at that time, the hotel was experiencing a series of thefts which seemed to occur every night. He remembered some Christmas gifts were stolen from the personnel office. He stated that is all he was told. He denied having a key to the personnel office. He stated he was requested to take a polygraph test, which he did. He recalled two other times he was polygraphed. Once was for employment, and the other was when he was audit manager and $1,000.00 was missing. This second polygraph was administered by Plummer. He testified that no one told him that Plummer was insisting that he be polygraphed in reference to the Christmas thefts. He stated he did not speak to any officials before taking the test and had no reason to suspect Plummer was involved in the thefts. He did testify that he thought Plummer favored certain employees over others.
Johnson stated that he did, on occasion, take pens and pencils from the hotel but didn't consider that stealing. He was not involved in any management decisions regarding Plummer and was not told of his resignation by management. He found out Plummer resigned by talking to other employees.

IV. ANALYSIS:

a) Constructive Discharge

We find that the jury was clearly wrong in its factual conclusion that Plummer was "constructively discharged." The evidence is overwhelming that four options were given to Plummer and that he chose to resign. Despite his contention that he was "guided" into choosing resignation, Plummer's own testimony suggests only a subjective impression of being forced to resign. Plummer admits that he was presented various options, but got the impression that he had no option other than resignation because (1) there was no specific transfer location given to him when he returned to see Gorelick; (2) the Marriott management felt it would be difficult for him to work in the number 2 spot in security; and (3) there was no set determinative spot within other departments at the New Orleans hotel. The jury's adoption of Plummer's impression of constructive termination is not reasonable in light of the evidence presented.
When Plummer returned to see Gorelick about his decision, none of the options had been withdrawn. In fact, on that occasion Plummer never asked either Gorelick or Johnston to investigate other openings. Plummer admits there was a reasonable concern over people within the New Orleans hotel believing that he was involved in the thefts and that there was concern on the part of management that he might not be happy working as a subordinate to a new director, however that option was still viable. Plummer's close relationship with the regional vice-president, Benedetto, strongly suggests that Plummer's other alternatives were also always viable and any one of them would have been pursued by management if Plummer so desired. Plummer admits he never pursued any other option but resignation. The evidence supports the conclusion that Plummer voluntarily chose resignation, and the jury's contrary conclusion, in our opinion, is unreasonable and clearly wrong. The only evidence supporting that contrary conclusion is Plummer's own subjective impression of forced resignation.

*857 b) Racial Discrimination

However, assuming arguendo that Plummer was in fact discharged, constructively or directly, we hold, as a matter of law, that there was insufficient evidence to support a finding that racial discrimination was the cause of his termination.
Although we are not favored with specified factual findings by the jury which led to their racial discrimination conclusion, Plummer argues that the following occurrences, which allegedly started under the regime of Ceriale and Gorelick, support and prove that conclusion.
1) His yearly evaluations declined;
2) A strained relationship existed between himself and John Ceriale which intensified after an incident in the French Quarter which involved a black male;
3) The relocation of Plummer's office to the rear dock and curtailment of his dining privileges;
4) Mike Johnston's refusal to allow the black security officers use of the bathroom near the personnel office;
5) Gorelick's refusal to allow Plummer to polygraph certain individuals in his investigation of the Christmas gift thefts;
6) The decision to polygraph Plummer, but not James Johnson, the white manager on duty the night of the thefts;
7) Marriott's failure to find a suitable hotel or department for Plummer to transfer pursuant to the options presented to him, thus forcing him to resign.
For the following reasons, we disagree. Analyzing each occurrence in accordance with a "manifest error" or "clearly wrong" standard, no reasonable inference of racial discrimination can be concluded.
The evaluation forms filed in evidence show that Plummer's ratings and overall evaluations remained consistent before and after Gorelick and Ceriale's arrival in 1985-86. Plummer's need and strength areas were always basically the same. Two factors must be considered. First, the actual forms themselves changed sometime in 1984, and, thereafter, as Gorelick testified, you must compare "apples with apples." Second, Plummer's evaluations are the subjective impressions of whoever the evaluator was at the time. Any conclusion of racial discrimination to be drawn by comparing Plummer's evaluations before and after 1985 is pure speculation.
Plummer argues that he was forced to work off the Marriott premises when asked to accompany Ceriale and his wife on the jogging incident and that Ceriale was angry because he didn't take further action against the person responsible for verbal abuse. However, Plummer's "off premises" complaint is more in the nature of a labor dispute regarding working conditions, rather than proof of racial discrimination. Plummer's belief about Ceriale's feeling are his own subjective impressions.
Plummer's appreciation of the motivation behind the bathroom and dining incidents is equally without support. When Mike Johnston requested the security officers not use the bathroom near the personnel office, it was not because they were black, but because they were hanging around the office several times per day. Johnson felt this was not proper. All security officers were the subject of Johnson's request, including the one white officer.
The curtailment of dining privileges was directed to all management and not just to Plummer. The reason was an economic down turn coupled with excessive use of the privilege. Once again, Plummer's complaint is founded in his subjective belief that it was directed toward him, but with no objective corroborating evidence.
Plummer's testimony was to the effect that he was shocked that Gorelick would not allow him to polygraph certain individuals. No evidence was presented that Gorelick's motivation was one of race. Gorelick explained that he denied the request because, at that point in the investigation, the extent of employee involvement was not yet known. This explanation is not unreasonable and is supported by Plummer's own testimony that he had no specific leads. The later decision to polygraph Plummer, along with the entire security department, was made after receiving the specific information in Angela Perkins' sworn statement. At that point in time, *858 the security department had been implicated in the theft ring. The initial decision not to polygraph James Johnson, the manager on duty the night of the theft, was not because he was white, but because he was not a department manager. Johnson was, in fact, subsequently polygraphed.
Plummer's assertion that he was effectively shut out of any single option is also not supported by the record. He testified that the options were fair and that he believed management was honest and sincere in presenting them. He also admitted that none of the options were ever withdrawn. During his unannounced visits to Gorelick and Johnston, Plummer never asked either man to investigate future openings. Furthermore, he never pursued any further grievance procedure if he felt race was a motivating factor.
Gorelick and Johnston stated that they went over the options with Plummer as to their pros and cons. They advised Plummer against remaining at the New Orleans hotel because of the negative impact it would have both on the hotel and on Plummer. In his testimony, Plummer admitted that they were concerned that people would believe he had been involved in the thefts. He also admitted that they felt that he might not be happy working as a subordinate to the new director. As we previously noted, the record does not support a finding that he was forced to choose the option to resign.

CONCLUSION:
Despite Plummer's subjective impressions that the Marriott no longer wanted him and that he was forced to resign because of his race, the record evidence simply does not support that conclusion. Marriott rebutted any prima facie presumption of discrimination by articulating and proving a reasonable non-discriminatory reason for the actions they undertook.
The evidence is overwhelming that the security department, under Plummer's immediate control, was involved in a serious theft ring that resulted in numerous (five of twelve) dismissals in that department. No other reasonable conclusion can be reached except that the integrity of the entire Marriott New Orleans security department had been compromised. It is undisputed that the thefts involved several security officers. Even if Plummer had actually been terminated, the evidence would have supported that decision by Marriott. Each occurrence cited by Plummer to support his "impression" of racial discrimination, is insufficient to support that impression as a legal conclusion.
Accordingly we reverse the trial court judgment and dismiss plaintiffs suit with prejudice.
REVERSED AND RENDERED.
NOTES
[1] The package included retirement, vacation and sick leave pay. Plummer was also permitted to stay on the payroll, with medical benefits, an additional period of time (approximately thirty days) in order to obtain increased pension benefits.
[2] Jury Interrogatory # 1.
[3] Jury Interrogatory #2.
[4] Wc cite the statute as amended in 1993. The pre-l 993 version is almost identical.
[5] 42 U.S.C. Sec. 2000c-2(a) provides:

"It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (emphasis added)
[6] The language of McDonnell Douglas, does not contain the exact verbiage as cited by the court in St. Mary's Honor Center. However, as applied to the facts of that case, the Supreme Court approved the district court's recitation of the above language as given by the district court.
[7] The title designation of the Marriott employees who testified arc those held during 1985-86 shortly before Plummet's resignation.
[8] Plummer took the polygraph on March 17, 1986.